IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BOBBIE JO WILSON, | ) | CASE NO.  5:20-cv-01340 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Bobbie Jo Wilson ("Plaintiff" or "Wilson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.   For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

*Prior Application*

Prior to filing the social security application that is the subject of the pending appeal, in October 2013, Wilson filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB"), which resulted in an unfavorable decision by an ALJ dated February 16, 2016.  Tr. 50, 139-158.  The Appeals Council denied Wilson's request for review of that decision on March 3, 2017, making the ALJ's February 16, 2016, decision the final decision.  Tr.

159-164.  Following an appeal to the Northern District of Ohio (Case No. 5:17-cv-00814), the

Commissioner's decision was affirmed on April 3, 2018.  Tr. 198-235.

*Current Application*

On April 5, 2017, Wilson protectively filed[1] an application for SSI. Tr. 50, 307-312.  She

alleged disability beginning on February 17, 2016.  Tr. 50, 165, 307.  Wilson alleged disability

due to memory problems, anxiety, depression, PTSD, neuropathy, chronic pain, chronic

migraines, sciatica, chronic gastritis, and traumatic brain injury.  Tr. 166, 241, 251, 332.

After initial denial by the state agency (Tr. 240-247) and denial upon reconsideration (Tr.

251-255), Wilson requested a hearing (Tr. 256-258).  On February 27, 2019, a hearing was held

before an Administrative Law Judge ("ALJ").  Tr. 76-138.  On May 17, 2019, the ALJ issued an

unfavorable decision, (Tr. 47-69), finding that Wilson had not been under a disability within the

meaning of the Social Security Act since April 5, 2017, the date the application was filed (Tr. 51,

63).[2]  Wilson requested review of the ALJ's decision by the Appeals Council.  Tr. 304-306.  On

April 23, 2020, the Appeals Council denied Wilson's request for review, making the ALJ's May

17, 2019, decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.    Personal, vocational and educational evidence

Wilson was born in 1981.  Tr. 85.  She was 37 years old at the time of the hearing.  Tr.

85.  Wilson lived with her friend/fiancé.  Tr. 86.  She had two children who were living in

Kentucky but her autistic son with Asperger's who was seventeen was going to be moving to

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. We may use this date to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 8/16/2021).

[2] In reaching his decision, the ALJ found that there was new and material evidence since the February 16, 2016, decision.  Tr. 50.  Therefore, the ALJ indicated that he was not bound by the findings in that prior decision.  Tr. 50.  Wilson does not challenge the ALJ's findings in this regard.

Ohio to live with her after he graduated.  Tr. 86, 123.  Wilson completed school until the 11th grade.  Tr. 88.  She can read and write in English and Spanish.  Tr. 88.

Wilson's past work included work in hotels where she worked third shift doing billing. Tr. 90, 91, 93.  Also, while working at the hotels, she was responsible for setting up breakfast and she took care of checking guests in and out.  Tr. 90-91, 93.  Wilson had past work in an assisted living facility where she cooked for the residents in the kitchen and assisted residents with their daily living activities, as needed.  Tr. 93-95.  Wilson also worked at Cracker Barrel during two different time periods.  Tr. 95-97.  When Wilson first worked at Cracker Barrel, she was in Texas and she worked in the retail shop and she also filled in as assistant manager when needed.  Tr. 95-96, 100.  Later, Wilson worked at Cracker Barrel when she lived in Kentucky. Tr. 96.  During that period of employment, Wilson was cross trained in all positions.  Tr. 96.

## B.    Medical evidence[3]

### 1.   Treatment history

#### a.   Physical impairments

On February 1, 2017, Wilson was treated at the Akron General Health System emergency room for left shoulder pain.  Tr. 421.  She reported that she had been walking her dogs and one of her dogs pulled quickly on the leash, causing immediate pain in her left shoulder.  Tr. 421. Wilson denied any prior issues with her shoulder but she relayed that she was being treated by

---

[3] Wilson's summary of the medical evidence includes medical records submitted after the ALJ hearing and/or evidence that post-dates the date of the ALJ's decision.  Doc. 16, pp. 6-7 (referencing Tr. 11, 14-16, 21, and 39). The Sixth Circuit has held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's substantial evidence review is limited to the evidence presented to the ALJ. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner*, 96 F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also Osburn v. Apfel*, No. 98-1784, 1999 WL 503528, at *4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [the] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ.").  Thus, evidence first submitted to the Appeals Council is not considered herein.

pain management for chronic musculoskeletal pain.  Tr. 421.  Wilson stated that she had back pain and fibromyalgia and her doctors were no longer prescribing narcotic pain medication; she was receiving different injections.  Tr. 421.  The emergency room physician prescribed Ultram and recommended that Wilson use a sling on a temporary basis, ice her shoulder, and follow up with her orthopedic physician.  Tr. 422.

Also, on February 1, 2017, Wilson saw her family practice physician Jennifer Watson, M.D., for a follow-up appointment regarding her heartburn.  Tr. 489-493.  On "review of systems," Wilson reported having malaise/fatigue, abdominal pain, heartburn, nausea, back pain, joint pain, myalgias, neck pain, sensory change and headaches, and memory loss.  Tr. 489.  Dr. Watson's physical examination findings were unremarkable.  Tr. 492.  With respect to Wilson's fibromyalgia, Dr. Watson indicated that Wilson would continue to follow up with pain management and continue with her current regimen.  Tr. 493.

On March 30, 2017, Wilson was treated at the emergency room at Alliance Community Hospital for back pain.  Tr. 562-563.  On physical examination, the emergency room physician observed vertebral tenderness and lumbar tenderness.  Tr. 562.  There were no motor/sensory deficits.  Tr. 562.  Wilson indicated "I think I'm having a flare[,]" and reported that her pain was in her neck and lumbar back.  Tr. 562.  Wilson was examined by both the emergency room physician and physical therapy because Wilson relayed that she had fallen two or three times over the prior two months.  Tr. 563.  Physical therapy felt that Wilson was "stable for home" but a prescription for a walker/rollator was provided so Wilson could get "through this 'flare[.]'"  Tr. 563, 713.  Wilson was treated with various medications and discharged home with a prescription for Tramadol to be used as necessary for breakthrough pain.  Tr. 563.  Wilson was discharged with a diagnosis of "acute on chronic lumbar back pain with sciatica[.]"  Tr. 563.

On April 5, 2017, Wilson saw Jonathon Raddish, CNP, at the Cleveland Clinic for her pain.  Tr. 704.  Wilson reported a history of fibromyalgia and pain in her neck, right arm, low back, and bilateral leg pain.  Tr. 704.  She indicated that her pain was impacting her quality of life.  Tr. 704.  Her pain was worse with activity and she got some relief with rest.  Tr. 704.  Wilson reported having weakness, numbness, and tingling.  Tr. 704.  Wilson was taking tizanidine and gabapentin.  Tr. 704.  She was using her rollator walker at the appointment and needed her medications refilled.  Tr. 704.  Wilson asked what else could be done to treat her pain.  Tr. 704.  It was noted that, during the prior year, Wilson had a successful "bilateral L5 LTR ESI[.]"  Tr. 704.  On examination, Nurse Raddish observed normal range of motion in the neck; decreased range of motion, tenderness, pain, and spasm in the lumbar back; no weakness or sensory deficit; abnormal straight leg raise; and an antalgic gait.  Tr. 708.  Nurse Raddish diagnosed protruded lumbar disc for which a "[b]ilateral L5 LTR ESI[]" was ordered.  Tr. 708.  Nurse Raddish provided Wilson with refills for gabapentin for lumbar radiculopathy; tizanidine for pain in the lower extremities; topiramate for fibromyalgia; lidocaine patches for other chronic pain.  Tr. 708-709.

On May 18, 2017, x-rays were taken due to bilateral hip and sacroiliac joint pain.  Tr. 1036, 1190.  The impression from the x-rays was: "Mild hypertrophic changes of the sacroiliac joints, otherwise unremarkable."  Tr. 1036, 1190.

On June 16, 2017, Wilson presented to the emergency room at Alliance Community Hospital with a chief complaint of leg pain.  Tr. 1086.  Wilson reported that she had fallen onto steps and her leg hit the railing.  Tr. 1086.  Wilson indicated she had been using "a variation of a walker at home because . . . of balance issues and freq[uent] falls."  Tr. 1086.  On examination, Wilson had full range of motion in her neck; no vertebral tenderness and normal range of motion

in her back; range of motion in her right knee was limited by pain; there was tenderness in the right lower extremity; there were no motor/sensory deficits; strength and sensation were normal; and speech was clear/fluent.  Tr. 1087.  Wilson was wrapped with an ace bandage and given Toradol IM.  Tr. 1087.  Wilson planned to follow up with her own physician regarding her knee. Tr. 1087.

A July 15, 2017, MRI of the pelvis showed "[m]ild bilateral gluteus minimus insertional tendinopathy[]"; and " "[l]imited imaging of the lower lumbar spine reveal[ed] disc degeneration at L4-L5 with a broad-based posterior central disc protrusion." Tr. 1084-1085, 1190, 1232-1233.

In September 2017, Wilson had a partial hysterectomy due to pelvic pain.  Tr. 1035-1038. Five days after her surgery, Wilson returned to the emergency room, complaining of abdominal pain.  Tr. 1041-1042.  Wilson had pain medication and was discharged home with an antibiotic and instructed to follow up with her own physician.  Tr. 1042.

On October 3, 2017, Wilson followed up with Dr. Jaime DeMarco at Mercy Pain Medicine regarding her chronic pain.  Tr. 1126.  Wilson relayed that her pain had improved since her last visit in August 2017.  Tr. 1126.  However, she indicated that the numbness, burning, and tingling in her right leg was getting worse.  Tr. 1126.  Wilson's medications that were prescribed by Mercy Pain Medicine (Tramadol, tizanidine, and gabapentin) were effective.  Tr. 1126.  On examination, Dr. DeMarco observed an antalgic gait, noting that Wilson ambulated using a cane. Tr. 1129.  Dr. DeMarco also noted some abnormal findings, including diminished sensation in right leg at all dermatomes, inability to perform straight leg raise and Faber's test on right leg secondary to pain, and reduced range of motion in the lumbar spine.  Tr. 1129.  Dr. DeMarco noted, however, "[s]ymptom magnification all through[] the spine exam." Tr. 1129.  Dr. DeMarco's impression was rheumatoid arthritis, chronic; ankylosing spondylitis; arthropathy of

cervical facet; cervical radiculopathy; chronic pain syndrome; and high-risk medication management.  Tr. 1129-1130.  Dr. DeMarco noted that Wilson had a reduction in her pain and improved level of functioning with activities of daily living.  Tr. 1130.  He noted the possibility of IV Ketamine infusion therapy in the future, if necessary.  Tr. 1130.

On October 17, 2017, Wilson saw Paige Pautler, a physician assistant, at the Cleveland Clinic for a follow up regarding her chronic pain.  Tr. 1183.  Wilson relayed that she was seeing a new pain management doctor who she really liked.  Tr. 1183.  Her medications included tramadol, gabapentin, Topamax (topiramate), and Zanaflex (tizanidine).  Tr. 1183.  Wilson reported excessive fatigue.  Tr. 1183.  Also, Wilson had tingling and numbness in her fingers and right leg.  Tr. 1183.  She indicated that she used both a cane and rollator for ambulation.  Tr. 1183.  Wilson had treated with an orthopedic surgeon for her knees and previously had cortisone injections in both of her knees and left shoulder.  Tr. 1183.  She tried physical therapy but it made her symptoms worse.  Tr. 1183.  An October 2016 EMG nerve conduction test of her upper and lower extremities was normal.  Tr. 1183.  Ms. Pautler noted a normal motor and sensory examination; "stressed gait[]"; "[d]iffuse tenderness over all joints[]" (right greater than left); "[d]iffuse, exquisite tenderness over entire spine[]"; "[p]ain upon range of motion of wrists, elbows, shoulders, and knees[]"; and "[n]o synovitis involving any joint."  Tr. 1189.  Ms. Pautler also noted that Wilson's range of motion in the ankles and spine was not assessed due to pain.  Tr. 1189.  Ms. Pautler's assessment included findings of generalized chronic pain with diffuse tenderness but no synovitis; history of fibromyalgia, having generalized pain and being very symptomatic; history of degenerative arthritis in the cervical and lumbar spine; PTSD, anxiety and chronic pain; and multiple comorbidities (e.g., gastroparesis, pulmonary nodules, and ovarian cysts).  Tr. 1191.  Ms. Pautler also noted that Wilson had a history of morning stiffness,

was positive for HLA-B27, and had mildly elevated CRP[4] levels.  Tr. 1191.  Thus, while imaging of the sacroiliac joints was normal, Ms. Pautler recommended that they continue to monitor for spondylarthritis.  Tr. 1191.

On January 17, 2018, Wilson saw Dr. Nikita Hegde, M.D., in the rheumatology department at the Cleveland Clinic for follow up concerning her fibromyalgia and generalized osteoarthritis, and monitoring for spondylarthritis with positive HLA-B27.  Tr. 1235.  Wilson relayed that she had noticed some swelling in her hands; her stiffness lasted one and a half hours; she was having increased pain from the waist up; she was scheduled for Ketamine infusions; she was referred for water therapy but could not attend because her wound from her hysterectomy was healing; and she was continuing to have excessive fatigue.  Tr. 1235.  On examination, Dr. Hegde observed diffuse tenderness over her joints and spine; there was no fullness in joints; there was pain with range of motion of her wrists, shoulders, knees and hips; Wilson ambulated with a walker; and there was weakness over the right lower extremity, with difficulty lifting the right leg.  Tr. 1242.  Dr. Hegde indicated that they would treat Wilson for fibromyalgia and degenerative arthritis, and they would continue to monitor closely for spondyloarthropathy.  Tr. 1243.

On March 20, 2018, Wilson had a follow-up visit at Mercy Pain Medicine with Dr. Jamesetta Lewis, D.O.  Tr. 1251.  Wilson reported that she continued to have diffuse body pain mainly in her back and neck.  Tr. 1251.  Her most recent IV Ketamine infusion was on January 25, 2018, and Wilson reported having 80% pain relief for four weeks.  Tr. 1251.  Wilson commented that she fell in January and that had made her symptoms worse and she had

---

[4] A positive HLA-B27 test and elevated C-reactive protein (CRP) can be indicators of ankylosing spondylitis. https://spondylitis.org/about-spondylitis/types-of-spondylitis/ankylosing-spondylitis/diagnosis/ (last visited 8/16/2021).

increased pain with sitting.  Tr. 1251.  On examination, Dr. Lewis observed an antalgic gait and Wilson ambulated with a cane.  Tr. 1254.  Other examination findings were: +5/5 motor strength on the left leg and +4/5 motor strength on the right leg; diminished sensation in the right leg at all dermatomes; there was limited range of motion with lumbar flexion and extension; there was symptom magnification during the spine exam; and there was tenderness at the tailbone with palpation.  Tr. 1254.  Treatment recommendations generally remained unchanged.  Tr. 1256-1257.  Dr. Lewis recommended that Wilson schedule another IV Ketamine infusion and also provided Wilson with a prescription for a donut pillow.  Tr. 1257.

On April 17, 2018, Wilson saw a physician assistant, Paige Hanchulak, in the rheumatology department for follow up.  Tr. 1325.  Wilson reported that her hands and joints were locking up on her.  Tr. 1325.  Wilson indicated that her pain was the worst in her hips, lower back, and joints.  Tr. 1325.  Wilson had stiffness for two hours in the morning and relayed that she had to sleep in a seated position.  Tr. 1325.  Wilson's joint symptoms were worse with activity but moving around helped with her back pain.  Tr. 1325.  Wilson was using both a cane and rollator for ambulation.  Tr. 1325.  Wilson relayed that she had a Ketamine infusion three months earlier "with immense improvement in her all over pain."  Tr. 1326.  She had been using a donut pillow and memory foam pillow to help with her back pain.  Tr. 1326.  Ms. Hanchulak provided Wilson with various treatment recommendations and instructed her to follow up with Dr. Hegde in three months.  Tr. 1334-1335.

Wilson saw Dr. Hegde on July 2, 2018, for follow up.  Tr. 1342.  Wilson reported having severe pain all over her body; swelling in her right knee and ankle and in her fingers and toes; and stiffness lasting at least two hours.  Tr. 1342.  She was continuing to receive Ketamine infusions.  Tr. 1342.  Wilson indicated that she continued to have excessive fatigue.  Tr. 1342.

On examination, Dr. Hegde observed tenderness in the joints in Wilson's hands as well as in her feet, knees, and hips; no fullness involving any joints; Wilson ambulated with a walker; and there was some weakness in the entire right lower extremity with difficulty lifting the right leg. Tr. 1349. Dr. Hegde noted that they would continue to treat Wilson for fibromyalgia and degenerative arthritis and that she was being monitored for inflammatory spondyloarthropathy but Dr. Hegde also noted that there was no fullness in Wilson's joints and the most recent inflammatory markers were normal. Tr. 1349, 1350. Wilson was taking Celebrex for her inflammation. Tr. 1350.

During a September 13, 2018, visit at Mercy Pain Medicine for follow up, Wilson complained of severe pain. Tr. 1292. She had recently been diagnosed with kidney stones and received emergency room treatment twice during the prior week due to severe pain in her back. Tr. 1292. While at the emergency room, Wilson was treated with IV Ativan, Toradol, and Dilaudid. Tr. 1292. She also received a prescription for Percocet. Tr. 1292. On examination, Wilson's gait was steady; she was using a wheeled walker for assistance; and she was able to get in and out of her chair without difficulty. Tr. 1295. Wilson's medications were continued for her arthropathy of the cervical facet. Tr. 1295. Because Wilson was experiencing some urological issues, her Ketamine infusions were on hold. Tr. 1296. Wilson was instructed to follow up in three months. Tr. 1296.

On October 23, 2018, Wilson saw an orthopedic provider regarding right knee and right shoulder pain that started on October 18, 2018. Tr. 1523. Wilson ambulated without an assistive device but was observed to have a limp. Tr. 1526. Wilson was instructed to use a sling for her shoulder injury along with ice and NSAIDs. Tr. 1527. With respect to her knee injury, Wilson

was instructed to continue to monitor her symptoms and to use ice and NSAIDs as needed.  Tr. 1527.

Wilson had a follow-up appointment on December 3, 2018, at Mercy Pain Medicine for her chronic pain.  Tr. 1576.  Wilson was interested in resuming her Ketamine infusions.  Tr. 1576.  She reported issues with memory, weight gain, and fatigue, problems that Wilson felt were related to her pain and mental health issues.  Tr. 1576.  On examination, Wilson's gait was steady; she was using a wheeled walker for assistance; and she was able to get in and out of her chair without difficulty.  Tr. 1579.  Wilson's medications were reviewed and continued.  Tr. 1579.  It was noted that Wilson's "current treatment results in improved symptom control and ability to perform ADLs."  Tr. 1579.

### b.  Mental health impairments

Wilson received mental health treatment through CommQuest Services, Inc., starting in 2016 and continued with treatment through at least 2019.  Tr. 921-951, 1121-1125, 1268-1273, 1276-1290, 1537-1550.  During an April 2016 assessment, Wilson's reported problems included anxiety, depression, and PTSD.  Tr. 923.  In July 2016, Wilson complained of "high anxiety, and panic attacks[]" and "[i]nsomnia."  Tr. 948.  She relayed that it started three years earlier after she had been in a car accident.  Tr. 948.  Wilson explained that she had chronic pain stemming from the car accident and she was being seen by pain management.  Tr. 948.  Wilson walked slowly and complained of pain.  Tr. 948.  Wilson's mood was described as "intense."  Tr. 949.  Her thought process was circumstantial; she was easily side-tracked; she exhibited mild grandiosity; and her speech was "[s]lowed."  Tr. 949.  Wilson's diagnosis was PTSD, unspecified and rule out personality disorder.  Tr. 950.  She was prescribed Valium.  Tr. 950.

In September 2016, Wilson's goals included decreasing her anxiety and depression.  Tr. 921.  Treatment notes reflect that Wilson's Valium was continued.  Tr. 942.

In November 2016, Wilson discussed finding out in May that her children who were in Kentucky were not being cared for properly and she was in a car accident.  Tr. 936.  She reported recently having a panic attack because someone she knew was possibly going to be released from prison and she was concerned about being able to protect herself from him because she was disabled.  Tr. 936.  Wilson also reported being concerned over other medical issues she was experiencing.  Tr. 936.   Wilson's mental health provider continued her on Valium.  Tr. 937.

In January 2017, Wilson reported having been more anxious.  Tr. 933.  Her dog had been hit by a bus and she was concerned about activity in her neighborhood.  Tr. 933.  Wilson's mental health provider continued to prescribe Valium.  Tr. 934.

During a July 2017 visit, Wilson relayed that she had recently returned from having visited her children in Kentucky.  Tr. 1123.  The father of her children had been charged criminally and was deported.  Tr.  1123.  Wilson was working on rebuilding her relationships with her children and their caregivers.  Tr. 1123.

When Wilson attending a counseling session in August 2018, Wilson reported an increase in her anxiety and nightmares.  Tr. 1284.  Wilson had recently been in a car accident – she was hit by another motorist in a parking lot.  Tr. 1284.  Wilson indicated that the increase in the amount of her nightmares started even before the car accident.  Tr. 1284.  At the visit, Wilson was observed to be using a wheeled walker.  Tr. 1284.  Wilson indicated that she was using the walker and not a cane because she was in a significant amount of physical pain.  Tr. 1284.

During a follow-up visit in September 2017, mental examination findings included circumstantial thought processes, anxious mood, constricted affect, good fund of knowledge and

memory, fair insight, good judgment, and good concentration.  Tr. 1121.  Wilson's diagnosis was
PTSD, chronic.  Tr. 1122.  She was continued on Valium (diazepam).  Tr. 1122.

In November 2017, Wilson relayed that she was going to try to get custody of her
children.  Tr. 1272.  During subsequent mental health visits in February and March of 2018,
Wilson continued to discuss her desire to get custody of her children and was planning to make a
trip to Kentucky for that purpose.  Tr. 1268, 1270.  She was continued on Valium and, in March
2018, in addition to a diagnosis of PTSD, chronic, Wilson was diagnosed with borderline
personality disorder.  Tr. 1269.

At an appointment in October 2018, Wilson reported being tired because she had driven
12 hours to get her children.  Tr. 1276.  Wilson's daughter and son were back living with Wilson
in her home.  Tr. 1276.  Wilson indicated that her daughter was doing well but she was having
behavioral problems with her son.  Tr. 1276.  Wilson was working to help her son with his
behavioral issues.  Tr. 1276.  Wilson relayed that her anxiety ranged from moderate to severe.
Tr. 1276.  Wilson's diagnoses were PTSD, chronic and borderline personality disorder.  Tr.
1278.  Her Valium was continued.  Tr. 1278.

During a January 2019 follow-up visit, Wilson relayed that she had shared custody of her
children but was interested in full custody.  Tr. 1540.  Wilson had anxiety but reported that the
Valium was helpful.  Tr. 1540.  She reported that she was continuing to experience chronic pain.
Tr. 1540.  Her diagnoses and medication remained unchanged.  Tr. 1542.

**2.  Opinion evidence**

**a.  Physical impairments**

Two state agency reviewing medical consultants provided opinions relative to Wilson's
alleged physical impairments.

On initial review, on June 19, 2017, Dr. Yeshwanth Bekal, M.D., completed a physical RFC assessment (Tr. 176-177), finding that Wilson had the following exertional limitations – she could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 4 hours; sit for a total of about 6 hours; and push and/or pull "[u]nlimited, other than shown, for lift and/or carry[.]"  Tr. 176.  Dr. Bekal explained the exertional limitations, stating that Wilson "has [history] of fibromyalgia and back pain w/limited ROM, abnormal gait, intermittent use of a walker[.]"  Tr. 176.  Dr. Bekal found that Wilson had the following postural limitations – she could never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs, kneel, crouch, and crawl; and she could frequently balance and stoop.  Tr. 176.  Dr. Bekal explained the postural limitations, indicating that Wilson "has [history] of fibromyalgia and back pain w/limited ROM, [Wilson] should never climb ladders and unprotected heights[.]"  Tr. 177.  Dr. Bekal found that Wilson had no manipulative, visual, or communicative limitations.  Tr. 177.  With respect to environmental limitations, Dr. Bekal found that Wilson would be required to avoid even moderate exposure to hazards, i.e., no climbing ladders, unprotected heights, or truck driving.  Tr. 177.

On reconsideration, on September 8, 2017, Dr. Venkatachala Sreenivas, M.D., completed a physical RFC assessment.  Tr. 190-192.  Dr. Sreenivas reached findings similar to those found by Dr. Bekal (Tr. 190-192), commenting "[e]arlier RFC reviewed.  No major changes made. Only minor changes made." (Tr. 192).

### b.  Mental health impairments

*Consultative examiner*

On August 10, 2017, Dr. Natalie Myer, Psy.D., completed a consultative psychological evaluation.  Tr. 1026-1032.  Wilson relayed that she did not complete high school but had almost

14

obtained her GED.  Tr. 1027.  However, Wilson was in a car wreck that "messed everything up."

Tr. 1027.  Wilson had last worked "right before the car wreck[]" at a hotel.  Tr. 1027.  She

reported loving the job.  Tr. 1027.  Wilson had nightmares from her accident and was still afraid

to drive.  Tr. 1028, 1030.  Her therapist encouraged her to try to do things she was afraid to do as

a way to help her get through her anxiety.  Tr. 1028.  Wilson indicated she did drive but needed

to take breaks.  Tr. 1030.  Since her accident, Wilson reported having issues with mobility and

pain.  Tr. 1030.  Dr. Meyer diagnosed PTSD and unspecified personality disorder (per records).

Tr. 1030.  Wilson was seeing her counselor twice each month.  Tr. 1030.  Wilson indicated that

counseling helped improve her mood.  Tr. 1030.

In the functional assessment portion of the evaluation, Dr. Meyer indicated that Wilson

might become confused during multistep tasks; she might require reminders and prompts to

complete tasks; she might become irritable when given reminders and prompts; symptoms of

PTSD might lead to decreased attention and concentration skills; she might have problems

forming work relationships and responding to supervision; she might become irritable if the

work environment does not meet her expectations; she might respond to stress and pressure by

becoming irritable; and work pressure might result in an increase in reported anxiety, discomfort,

or other behavior that would impact Wilson's ability to cope appropriately.  Tr. 1031-1032.

*State agency reviewing consultants*

On initial review, on August 24, 2017, Dr. Deryck Richardson, Ph.D., completed a

Psychiatric Review Technique ("PRT") (Tr. 173-174) and a mental RFC assessment (Tr. 177-

179).  In the PRT, Dr. Richardson found that Wilson had no limitations in her ability to

understand, remember, or apply information and she had moderate limitations in her ability to:

interact with others; concentrate, persist, or maintain pace, and adapt or manage oneself.  Tr.

174.  In the mental RFC assessment, with respect to sustained concentration and persistence

limitations, Dr. Richardson found that Wilson's impairments restricted her to 2-3 step tasks that

do not require a rapid pace.  Tr. 178.  With respect to social limitations, Dr. Richardson found

that Wilson had a history of social anxiety and she was limited to occasional contact with the

general public and coworkers.  Tr. 178-179.  With respect to adaptation limitations, Dr.

Richardson found that Wilson had an active diagnosis of PTSD with "cluster B personality" and

was limited to working in an environment with infrequent changes and no high quotas.  Tr. 179.

On reconsideration, on September 8, 2017, Dr. Paul Tangeman, Ph.D., completed a PRT

(Tr. 188-189) and mental RFC assessment (Tr. 192-194).  Dr. Tangeman reached findings

similar to those of Dr. Richardson, noting in his RFC assessment "[n]o new change in condition.

No additional [psychological] evidence discovered that would warrant significant change in

[mental RFC].  The initial assessment is consistent with the overall findings and supported on

[reconsideration]."  Tr. 194.

**C.**     **Testimonial evidence**

**1.**     **Plaintiff's testimony**

Wilson testified and was represented by counsel at the February 27, 2019, hearing.  Tr.

85-123, 126.

When the ALJ asked Wilson what she felt was the number one reason she felt she could

not work, Wilson indicated it was her spinal issues.  Tr. 101.  Wilson's spinal issues were in her

neck as well as her lower back.  Tr. 101.  Wilson explained that her "body locks up, [a]nd [she]

was diagnosed with . . . Ankylosing Spondylitis."  Tr. 102.  Also, she has been diagnosed with

chronic rheumatoid arthritis – she has severe flare-ups with chronic pain.  Tr. 102.  Wilson

estimated that she has a flare-up three to four times each week.  Tr. 102.  Wilson indicated it was

very hard for her to do a lot of things, not only when she was having a flare-up but all the time. Tr. 102.

Wilson has fibromyalgia for which she was receiving monthly Ketamine infusions.  Tr. 105.  After an infusion, Wilson has pain for about three days and then, with her medications, she is better able to walk and do some household activities, e.g., cooking and dishes.  Tr. 105. However, her ability to perform household chores was limited.  Tr. 117-118.

In addition to infusions, Wilson tries to alleviate her pain by using medications, a heating pad on her back, and topical creams on various body parts (usually on her neck or back).  Tr. 109.  Wilson was taking Tramadol for pain.  Tr. 110.  Wilson was taking a muscle relaxer for spasms and spasticity and Celebrex for rheumatoid arthritis.  Tr. 110.  She was taking Neurontin and Imitrex for migraines.  Tr. 110-111.

Wilson indicated she had a hard time sitting straight because of issues with her tailbone and, during the hearing, Wilson commented that she was having a hard time sitting.[5]  Tr. 102-103.  She estimated being able to sit for five to ten minutes before having to stand up or move positions.  Tr. 103.  Wilson also relayed that she has a hard time sleeping or lying down because of her pain and her "body locks up on [her] due to spasms and spasticity."  Tr. 103.  For example, her leg will lock up on her and she needs assistance pulling her leg out of that position. Tr. 103-104.  Also, her hands lock up on her constantly and she can only use them for about five to ten minutes.  Tr. 121.  She hardly uses her computer or iPad and, if she does, it is only for about five minutes.  Tr. 121.  When her hands lock up on her, it takes about an hour to "unlock" her hands and be able to use them again.  Tr. 121-122.

---

[5] The ALJ informed Wilson that she could stand or move around during the hearing.  Tr. 102.

Wilson uses an inhaler for her asthma.  Tr. 112-113.  When asked whether her asthma continued to be an issue for her, Wilson indicated that it was "not as bad."  Tr. 112.  Wilson commented that she had stopped smoking cigarettes about a year prior but she had starting vaping after a death in her family.  Tr. 113.

During the hearing, Wilson was using a rollator.  Tr. 104.  Wilson explained that, since her most recent Ketamine infusion, she had been using her rollator more often, which she explained was almost daily.  Tr. 104-105.  Prior to her most recent infusion, Wilson had to use her rollator for the first week following her infusion treatments and then she would be able to use a cane.  Tr. 106-107.  Using her rollator, Wilson estimated being able to travel about ten feet before needing to stop.  Tr. 107.  Wilson's ability to walk was similarly limited when using a cane.  Tr. 108.  Wilson noted that in the past she used to run 12 miles a day.  Tr. 108.  With respect to her ability to lift, Wilson indicated that she had dropped a five-pound bag of sugar and could not lift her dog who is only seven-and-a-half pounds.  Tr. 109.  Wilson explained it was hard for her to lift things because doing so caused pinching in her spine.  Tr. 109.

Wilson was sleeping in her living room because she was no longer going upstairs.  Tr. 120.  She had not gone upstairs for about six months prior to the hearing.  Tr. 120.  Wilson explained that she stopped going upstairs because her legs and arms were not strong enough and she afraid of falling.  Tr. 120.  Pulling herself up the stairs hurts her shoulders and "sends a shock through [her] neck, and then it goes down through [her] back, and it hurts [her] hips."  Tr. 120.

In addition to an increased need to use her rollator, since her most recent infusion, Wilson was having more frequent migraines.  Tr. 111.  As a result, she was prescribed Imitrex to help with her migraines.  Tr. 111.  Wilson's migraines last for about a day.  Tr. 112.  Once Wilson

takes her medications, she sleeps for about eight hours.  Tr. 112.  Wilson's migraines make her sensitive to light and sound.  Tr. 112.

Wilson has issues with her bladder that have caused incontinence and accidents.  Tr. 119. As a result, she has to wear pads.  Tr. 119.

In addition to inquiring about Wilson's physical impairments, the ALJ asked Wilson to explain how her mental health impairments, including her anxiety and PTSD, impacted her.  Tr. 113-114.  As a result of her PTSD, Wilson indicated that she experiences nightmares and flashbacks and she avoids certain places out of concern that it will bring back negative memories.  Tr. 114.  Also, Wilson noted that she had recently put in surveillance cameras in her home due to concerns over her safety.  Tr. 114.

Wilson explained that her anxiety is triggered by her flashbacks about her car accident and worrying about her children.  Tr. 114-115.  Wilson reported having a panic attack the prior week and she had an anxiety attack the day of the hearing because she was having a hard time finding the location of the hearing.  Tr. 115.

Wilson isolates herself from others by staying in her home and has a hard time being in public.  Tr. 115, 116.  For example, when it is time for a review regarding medical coverage or food stamps, she uses the phone interview option because she cannot go to their offices.  Tr. 116. Also, she is no longer able to attend church.  Tr. 116.  Thus, Wilson has very limited social contact with people other than her friend/fiancé, children, her sisters, and her parents.  Tr. 116.

Wilson reported being easily confused and having a hard time focusing.  Tr. 115-116. Wilson also experiences crying spells, moodiness, and irritability.  Tr. 116.  She also has problems with her short-term memory and has started to have problems with her long-term memory as well.  Tr. 122.  For example, if Wilson watches a movie, she cannot remember what

happened at the beginning of a movie.  Tr. 122.  However, if she watches an hour-long television show, she is able to remember whether she previously watched it.  Tr. 122.

Wilson takes medication for her mental health impairments.  Tr. 116-117.  Also, Wilson sees counselors/therapists and finds that it is helpful.  Tr. 116-117.  Wilson's mental health treatment providers are at CommQuest.  Tr. 122.  She was seeing her psychiatrist every three months and her therapist every two weeks.  Tr. 122-123.  However, there were times that she had to cancel because she was in too much pain.  Tr. 123.

Wilson can manage her personal hygiene but noted that she likes to stay in her pajamas and there are days when she does not feel like doing anything.  Tr. 117.  Also, Wilson explained that it was difficult for her to shower because she falls a lot.  Tr. 117.  She noted that a shower chair had been prescribed for her.  Tr. 117.  Wilson's therapist has encouraged Wilson to try to get out of the house and do something once each week to help her get over her anxiety.  Tr. 118.  Wilson tries to do so but she still gets panicked.  Tr. 118.  Wilson goes grocery shopping once a month but she has to have her fiancé accompany her.  Tr. 118.

Wilson relayed that she loves to sing, and, at one point, she tried to learn how to play the guitar.  Tr. 119.  However, she is no longer able to play the guitar because it hurts to do so.  Tr. 119.

When asked to compare her condition to how it was three years earlier, Wilson indicated her condition was worse, more particularly, her mobility and memory.  Tr. 123.

**2.  Vocational Expert**

A Vocational Expert ("VE") testified at the hearing.  Tr. 124-135.   The VE described Wilson's past work, explaining that the work at the hotel was a composite job consisting of night auditor (a sedentary, skilled job), dining room attendant (a medium, unskilled job), and kitchen

helper (a medium, unskilled job).  Tr. 126-127.  The VE also explained that the work at the nursing home was a composite job consisting of cook (a medium, skilled job) and personal care aide (a medium, lower-level, semi-skilled job).  Tr. 127.  Lastly, the VE described Wilson's work at Cracker Barrel as a sales-clerk, a light, lower-level, semi-skilled job.  Tr. 127.

For his first hypothetical, the ALJ asked the VE to assume an individual of Wilson's age and with her education and work experience who can perform a full range of sedentary work subject to the following limitations – limited to frequent use of hand controls bilaterally; limited to frequent reaching overhead bilaterally; limited to frequent handling or fingering bilaterally; limited to occasional climbing of ramps and stairs but never able to climb ladders, ropes or scaffolds; limited to occasional balancing, stooping, kneeling, crouching or crawling; avoidance of all exposure to unprotected heights and dangerous machinery; limited to the performance of simple routine tasks, but not at production rate pace (i.e., no assembly line type of setting); limited to frequent interactions with supervisors, coworkers or the general public; limited to tolerating few changes in the workplace; and would require use of cane for ambulation and station.  Tr. 127-128.  The VE indicated that the described individual would be unable to perform Wilson's past work.  Tr. 129.  However, there was work in the national economy that the described individual could perform, including surveillance system monitor; food and beverage order clerk; and touch-up screener, printed circuit boards.  Tr. 129.  The three jobs identified were classified as sedentary, unskilled positions and the VE provided national job incidence data for each of the identified jobs.  Tr. 129.

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical, except, instead of needing a cane for ambulation, the individual would need a rollator (a rolling walker) for ambulation and station.  Tr. 130.  The VE indicated that he believed that the

individual would be able to perform the jobs identified in response to the first hypothetical, noting that, since the Dictionary of Occupational Titles does not specifically address use of a cane or rollator, his opinion was based on his experience having performed job analysis and labor market surveys.  Tr. 130.

For his third hypothetical, the ALJ asked the VE to consider the individual described in the second hypothetical except that, in addition to regularly scheduled breaks, the individual would also require one ten-minute break per hour.  Tr. 130.  The VE indicated that there would be no work available for the described individual.  Tr. 130-131.

For his fourth hypothetical, the ALJ asked the VE to consider the individual described in the second hypothetical except that the individual would also be absent four times per month. Tr. 131.  The VE indicated that there would be no work available for the described individual. Tr. 131.  The VE stated that employers would tolerate one absence per month.  Tr. 132.

In response to questioning by Wilson's counsel, the VE indicated that there would be no jobs available if the individual described in the first hypothetical needed a sit/stand option and if the individual would need to use the cane when standing.  Tr. 134.  In response to additional questioning, the VE stated that, if the first or second hypothetical was modified to indicate that the individual could only occasionally, rather than frequently, handle and finger, the "sedentary, unskilled occupational based would be greatly eroded and the only job that I could say would be the surveillance system monitor position, but other than that, there's no other sedentary, unskilled jobs."  Tr.  135.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[6] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[7] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.

Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his May 17, 2019, decision, the ALJ made the following findings:[8]

1.  Wilson has not engaged in substantial gainful activity since April 5, 2017, the application date.  Tr. 52.

2.  Wilson has the following severe impairments: obesity, fibromyalgia, rheumatoid arthritis, chronic pain syndrome, ankylosing spondylitis, asthma, cervical degenerative disc disease, lumbar degenerative disc disease, sacroiliac joint degenerative joint disease, migraines, post-traumatic stress disorder (PTSD), and anxiety disorder.  Tr. 52-54.

3.  Wilson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments, with particular consideration provided to listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 3.03 (asthma), 12.06 (anxiety-related disorders), and 12.15 (trauma- stressor-related disorders).  Tr. 54-56.

4.  Wilson has the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a) with the following restrictions: she can frequently use hand controls bilaterally; she can frequently reach overhead with the bilateral upper extremities; she can frequently handle and finger with the bilateral upper extremities; she can occasionally climb ramps and stairs but can never climb ladders, ramps or scaffolds; she can occasionally balance, stoop, kneel, crouch and crawl; she must avoid all exposure to unprotected heights and hazardous machinery; she is limited to simple routine tasks but not at a production rate pace; she can have frequent interactions with supervisors, coworkers and the general public; she can tolerate few changes in routine work setting; and she requires a rollator for ambulation and station.  Tr. 56-61.

---

[8] The ALJ's findings are summarized.

5.  Wilson is unable to perform any past relevant work.  Tr. 61.

6.  Wilson was born in 1981 and was 35 years old, which is defined as a younger individual age 18-44, on the date the application was filed.  Tr. 61.

7.  Wilson has a limited education and is able to communicate in English.  Tr. 61.

8.  Transferability of job skills is not material to the determination of disability.  Tr. 61.

9.  Considering Wilson's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Wilson can perform, including surveillance system monitor; food and beverage order clerk; and touch-up screener, printed circuit boards.  Tr. 61-63.

Based on the foregoing, the ALJ determined that Wilson had not been under a disability, as defined in the Social Security Act, since April 5, 2017, the date the application was filed.  Tr. 63.

## V. Law & Analysis

### A.  Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.    The ALJ did not err in his evaluation of the evidence**

In her first argument, Wilson argues that the ALJ did not properly evaluate the evidence and erred when he failed to find that Wilson was unable to ambulate effectively.  Doc. 16, pp. 13-18.  6, pp. 11-16.  Within this first argument, Wilson raises multiple sub-arguments,[9] i.e., she contends that there is a contradiction in the decision based on the ALJ's consideration of the state agency medical consultants' opinions at Step Three and his consideration of those opinions when formulating the RFC; the ALJ did not properly evaluate the evidence as it relates to Listings 1.02 and 1.04, including evidence relating to her use of the rollator; the ALJ did not properly evaluate her mental impairments and should have included more restrictive mental limitations in the RFC; the ALJ failed to properly consider the effects of her fibromyalgia as required by SSR 12-2p; and the ALJ failed to properly evaluate the combination of Wilson's impairments in conjunction with her obesity as required under SSR 02-1p.

Many of the above arguments are not fully developed and therefore may be waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way,

---

[9] When submitting future briefs before this Court, counsel is urged to more clearly identify each argument being presented rather than presenting arguments under a general "heading" or as a general "argument."

leaving the court to . . . put flesh on its bones.") (internal citations omitted) (alterations in original). Nevertheless, to the extent not waived, the Court has addressed the various arguments below.

### 1. The alleged contradiction in the decision based on the ALJ's consideration of the state agency medical consultants' opinions

At Step Three, the ALJ observed that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment." Tr. 54. The ALJ then proceeded to note that the state agency medical consultants also reached the same conclusion, i.e., that Wilson's impairments did not satisfy the requirements of any listed impairment. Tr. 54.

At Step Four, when assessing Wilson's RFC, the ALJ considered and weighed the opinion evidence, including the opinions offered by the state agency medical consultants. Tr. 59. In doing so, the ALJ stated the following:

> I have reviewed the opinions of the State Agency medical file consultants who reviewed the physical aspects of the claim. The consultants opined that the claimant would be capable of performing a light level of exertion but no more than four hours of standing and/or walking during the workday as well as additional postural and environmental limitations. The opinions appear to address the claimant's back pain and related issues, however, do not fully account for the upper extremity symptoms and the claimant's ongoing use of a cane or rollator. Accounting for these additional factors, I find the claimant is limited to a sedentary level of exertion with further restrictions regarding her ability to reach or use the upper extremities. For these reasons I do not find the State Agency file consultants' opinions to be persuasive.

Tr. 59.

Wilson contends that the ALJ's decision to rely on the state agency medical consultant opinions at Step Three and then to later find them unpersuasive because "their opinions did not consider all the relevant evidence" is a "contradiction on the face of the decision" that resulted in "harmful error[.]" Doc. 16, p. 14. The underlying premise of Wilson's argument, i.e., that the

27

state agency medical consultants failed to consider relevant evidence and/or that the ALJ found that the state agency medical consultants failed to consider relevant evidence, (Doc. 16, p. 14), is flawed.

The ALJ did not conclude that the state agency medical consultants failed to consider relevant evidence.   He found only that their opinions did not fully account for an ongoing need to use a cane or rollator or upper extremity symptoms, i.e., the ALJ determined that the evidence supported a more restrictive RFC than the state agency medical consultants had assessed. Moreover, the state agency medical consultants did not, as Wilson suggests, ignore evidence regarding Wilson's use of a cane or rollator or her upper extremity symptoms.  *See e.g.*, Tr. 172-173 (noting medical records showing decreased range of motion and pain in cervical spine; decreased upper extremity strength 4/5; shoulder, back pain); Tr. 175, 190 (noting evidence showing intermittent use of walker); Tr. 176-177, 191 (indicating that exertional and postural limitations were due in part to limited range of motion and intermittent use of walker).

Although the ALJ concluded that the evidence supported a more restrictive RFC than the state agency medical consultants found, Wilson has not shown that ALJ was precluded from or erred by relying at Step Three on the state agency medical consultants' opinions when concluding that Wilson's impairments did not satisfy the requirements of any listed impairment. Tr. 54.

Wilson has not shown a contradiction on the face of the decision amounting to reversible error.  Nor has she shown that reversal or remand is required in order for the ALJ to further assess or explain his consideration and weighing of the opinions offered by the state agency medical consultants.

## 2. Consideration of Listings 1.02 and 1.04[10] and evidence regarding ability to ambulate effectively

Wilson's next "sub-argument" centers on the ALJ's analysis of her physical impairments at Step Three.  Doc. 16, pp. 14-15.  Wilson contends that the ALJ erred by not finding that her impairments met or equaled Listing 1.02 or 1.04.  Doc. 16, p. 15.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Thacker v. SSA*, 93 Fed. Appx. 725, 727-728 (6th Cir. Mar. 12, 2004) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker* 93 Fed. Appx. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).

Listing 1.02 is defined as:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

---

[10] Effective April 2, 2021, the criteria for the Listing of Impairments was revised. https://www.federalregister.gov/documents/2020/12/03/2020-25250/revised-medical-criteria-for-evaluating-musculoskeletal-disorders (last visited 8/16/2021).  These new rules apply to new applications filed on or after the effective date and to claims that are pending on or after the effective date.  *Id.*  Since the new rules were not in effect at the time that the final decision was rendered in this case, as the parties did in this case, the Court has utilized the listing rules that were in effect at the time the ALJ rendered his decision.  *See id.*, n. 2. (indicating that the Social Security Administration expects that Federal courts will review a final agency decision under the rules in effect at the time the decision was rendered).

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Listing 1.04 is defined as:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1

At Step Three, when analyzing whether Wilson's impairments or combination of impairments met or equaled one of the listed impairments, as noted above, the ALJ observed that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment[]" and the state agency medical consultants also found no listing level impairment or combination of impairments.  Tr. 54.  Additionally, the ALJ analyzed

Wilson's impairments under various listings, including 1.02 and 1.04. Tr. 54-55. In the end, the ALJ concluded that Wilson did not have an impairment or combination of impairments that met or equaled the criteria for any listed impairment. Tr. 54-55.

> With respect to Listings 1.02 and 1.04, the ALJ stated:

> Listing 1.02A requires that there be a gross anatomical deformity, chronic joint pain and stiffness with signs of limitation of motion, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint. As there is no evidence of gross anatomical deformity or findings of joint space narrowing of any affected joint, the listing criteria are not met.

> Regarding the claimant's back and neck pain, I reviewed the criteria set forth in listing 1.04, which criteria is the compromise of a nerve root or the spinal cord with additional specific findings. However, as there is no evidence of nerve root or spinal cord compromise, the listing criteria cannot be met.

Tr. 55.

Wilson asserts that, "Since the rollator was medically necessary in this matter, Plaintiff would have been unable to use both upper extremities when ambulating or standing." Doc. 16, p. 15. Thus, she argues, "Contrary to the ALJ's brief discussion regarding Listings 1.02 and 1.04, Plaintiff was unable to ambulate effectively. Finding that she did not meet or equal either Listing 1.02 or 1.04, therefore, was harmful error in this matter and should result in a remand and/or award of benefits." Doc. 16, p. 15.

Even assuming arguendo that Wilson's use of a rollator would satisfy the inability to ambulate effectively requirement in Listing 1.02 or 1.04, Wilson must satisfy the remaining criteria in the listings. In an attempt to meet her burden, Wilson points out that there is evidence of reduced strength and sensation and weakness in the lower extremities, diffuse tenderness in her joints and spine with decreased range of motion in her right shoulder, and broad based disc protrusion at L4/5 with central disc protrusion. Doc. 16, p. 14, Doc. 20, p. 1. However, the ALJ

considered evidence upon which Wilson relies to support her claim in this appeal.  *See* Tr. 57 ("She reports diffuse pain and numbness and tingling in the hands, feet and bilateral legs and endorsed weakness of the arms, hands and right leg."); Tr. 57 ([S]he showed diminished sensation of the right leg at all dermatomes[.]"); Tr. 58 ("A later MRI in July 2017 showed disc degeneration at L4-5 with broad-based posterior central disc protrusion[.]").  Additionally, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. Nov. 18, 2004) (internal citation and quotations omitted).

The Court finds that Wilson has not demonstrated that she satisfies Listing 1.02 or 1.04 and she has not shown that the ALJ erred in evaluating her impairments under Listing 1.02 or 1.04.  In essence, Wilson seeks to have the Court consider the evidence de novo.  However, that is not this Court's role.  *Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").  And, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

For the reasons explained herein, the Court finds that Wilson has not shown that reversal or remand is required in order for the ALJ to further assess or explain his consideration of physical impairments under Listing 1.02 or 1.04.

### 3.    Consideration of mental health impairment evidence

Wilson argues that the ALJ did not properly evaluate her mental health impairments and should have included more restrictive mental health limitations in the RFC.[11]  Doc. 16, pp. 15-16.

As part of his Step Three analysis, the ALJ found that Wilson had no limitation in her ability to understand, remember or apply information and moderate restrictions in social functioning; ability to concentrate, persist or maintain pace; and ability to adapt or manage herself.  Tr. 55-56.

Wilson asserts that, since the ALJ found the opinion of Dr. Meyer, the consultative examiner, persuasive, the ALJ should have found that Wilson was more limited and erred by not including conclusions and limitations contained in the opinion of Dr. Meyer in the mental RFC. Doc. 16, pp. 15-16.   However, Wilson has not shown that Dr. Meyer's findings and opinions required more restrictive mental health limitations than those contained in the ALJ's RFC as assessed.

Moreover, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).  The ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  When assessing a claimant's RFC, an ALJ "is not required to

---

[11] In presenting this particular "sub-argument," Wilson contends that the ALJ's conclusion that Wilson had moderate or no limitations in the four areas of mental functioning was error because the ALJ failed to consider all of her symptoms.  Doc. 16, p. 16. This argument is not fully developed and therefore may be considered waived.  *See McPherson, supra.*  To the extent that this argument is intended to supplement Wilson's later argument wherein she claims the ALJ erred when evaluating her symptoms, the Court has addressed that argument below.

recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*  Further, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).  Also, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014).

Considering the foregoing, the Court finds that, while the ALJ found Dr. Meyer's opinion to be persuasive, the ALJ did not commit reversible error by not adopting and incorporating into the RFC each conclusion and limitation contained in Dr. Meyer's opinion.

### 4.    Consideration of fibromyalgia

Wilson takes issue with the ALJ's consideration of her fibromyalgia.  Doc. 16, p. 16. Wilson acknowledges that the ALJ went through the criteria set forth in SSR 12-2p and considered her fibromyalgia at Step Three.  Doc. 16, p. 16.  However, she asserts that the ALJ "failed to assess [her] fibromyalgia and other symptoms at steps four and five[]" and argues that those symptoms result in exertional limitations that prevent her from performing any work in the national economy.  Doc. 16, p. 16.

Wilson's argument regarding the ALJ's consideration of her fibromyalgia is cursory and not fully developed.  Therefore, this argument may be considered waived.  *See McPherson, supra*.  To the extent that this argument is intended to supplement her later argument wherein she claims the ALJ erred when evaluating Wilson's symptoms, the Court has addressed that argument below.

### 5.    Consideration of obesity in combination with other impairments

Wilson argues that the ALJ failed to properly evaluate the combination of her impairments in conjunction with her obesity as required under SSR 02-1p.  Doc. 16, pp. 17-18.

SSR 02-1p, *Evaluation of Obesity*, 2002 WL 34686281 (Sept. 12, 2002), provides that obesity will be considered by an ALJ in assessing a claimant's disability claim.  However, SSR 02-1p does not establish a particular formula or method for evaluating obesity at each of the sequential steps in the evaluation process.  *See Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411-412 (6th Cir. Jan. 31, 2006) ("Social Security Ruling 02-01p does not mandate a particular mode of analysis."); *see also Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. Dec. 22, 2009) ("'Social Security Ruling 02-01p does not mandate a particular mode of analysis,' but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.") (quoting and relying on *Bledsoe*, 165 Fed. Appx. at 411-412).

The ALJ considered Wilson's obesity throughout the sequential evaluation, including the impact that Wilson's obesity might have on other impairments.  Tr. 53, 54, 58-59.  At Step Two, the ALJ found that obesity was a severe impairment.  Tr. 53.  At Step Three, the ALJ considered whether Wilson's obesity in combination with other her other impairments met or equaled a listing.  Tr. 54.  At Step Four, the ALJ again considered Wilson's obesity when assessing her

RFC.  Tr. 59.  In doing so, the ALJ noted that Wilson's BMI was in the "obese" range (Tr. 58) and stated in part:

> Obesity is often associated with respiratory and musculoskeletal impairments, and can negatively impact all impairments.  Thus, when obesity is combined with other impairments it can result in greater limitations on an individual.  In determining the residual functional capacity set forth above, I have considered the claimant's obesity pursuant to SSR 02-1p and addressed its added impact on the claimant.

Tr. 59.

The ALJ did not ignore evidence relating to Wilson's obesity.  Taking into account Wilson's obesity in combination with her other impairments, the ALJ assessed a sedentary RFC with additional physical restrictions, including postural, manipulative, environmental limitations, and the need to use a rollator for ambulation and station, as well as mental RFC restrictions.  Tr. 56.  As indicated above, there is no specific formula that an ALJ is required to utilize when considering a claimant's obesity.

Wilson has not identified or provided a medical opinion to support her claim that her obesity, in combination with her other impairments, supports a more restrictive RFC.  Furthermore, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a); 20 C.F.R. § 404.1546(c).  Wilson has not shown that the ALJ failed to comply with these Regulations, nor has she shown that the ALJ failed to consider her obesity in accordance with SSR 02-1p.  Accordingly, the Court finds Wilson's claim that the ALJ erred in her assessment or consideration of her obesity to be without merit and not a basis for reversal or remand.

**C.    The ALJ did not err in his assessment of Wilson's subjective allegations**

Wilson contends that the ALJ did not properly assess the credibility of her subjective allegations regarding her symptoms.  Doc. 16, pp. 18-21

A claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability.  20 C.F.R. § 40415929(a); SSR 16-3p, 2017 WL 5180304.   When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms.  20 C.F.R. § 4004.1529(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain.  SSR 16-3p, 2017 WL 5180304, * 3-4.  Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id.* at * 3, 5-8.

To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, * 5-8. In addition to this evidence, the factors set forth in 20 C.F.R. 416.929(c)(3) are considered.  *Id.* at *7-8.  Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and

any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.*   The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id*. at * 10.

An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

The ALJ considered Wilson's subjective complaints, including her complaints regarding pain throughout her body that impacted her ability to sit, stand and walk; issues with balance; neuropathy in upper extremities; migraines; asthma; and difficulty being in public and crowds. Tr. 57.  After considering the evidence, the ALJ concluded that Wilson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision." Tr. 57.

In reaching this conclusion, the ALJ considered *inter alia* objective test results, including x-rays and MRIs; medications and treatment prescribed, including response to treatment; and activities of daily living.  Tr. 57-60.

More particularly, the ALJ noted that x-rays taken in October 2018 of the knee and shoulder revealed no significant findings and it was recommended that she use ice and NSAIDs with physical therapy but there was no indication that physical therapy occurred.  Tr. 58.  Also,

bilateral hip x-rays taken in May 2017 showed only mild hypertrophic changes of the sacroiliac joints.  Tr. 58.  The ALJ also considered a July 2017 MRI that showed disc degeneration at L4-5 with broad-based posterior central disc protrusion but no degenerative changes of the hips.  Tr. 58.

When assessing Wilson's subjective statements, the ALJ also considered Wilson's prescription for a rollator as well as her oral medications and lumbar epidural steroid injections. Tr. 58.  The ALJ considered evidence regarding IV Ketamine infusions with 80% relief for four weeks.  Tr. 58.  The ALJ considered evidence concerning Wilson's asthma, noting that Wilson manages with asthma and has been treated for bronchitis.  Tr. 58.  The ALJ noted that there was no evidence of specific treatment for migraines but considered Wilson's testimony that she periodically had migraines and used prescription medication to help with her symptoms.  Tr. 58.

The ALJ also considered Wilson's medical treatment for her mental health impairments, which included counseling as well as a prescription for Valium.  Tr. 59.  The ALJ took into account evidence reflecting that, notwithstanding Wilson's past car accident trauma, in 2018, she drove 12 hours to pick up her children after regaining custody of them.  Tr. 59.  Additionally, the ALJ observed that, "[w]hile [Wilson] reports difficulty being around others, she is able to grocery shop and seek treatment without any observed difficulties regarding her ability to interact with others."  Tr. 60.

Notwithstanding the ALJ's thorough discussion of the evidence and assessment of her credibility, Wilson contends that "the ALJ failed to even mention the evidence which supported Plaintiff's credibility about her symptoms."  Doc. 16, p. 21, Doc. 20, p. 2.  For example, she points out that she testified that she had a hard time showering, liked to stay in her pajamas, and slept in a chair downstairs.  Doc. 16, p. 20, Doc. 20, p. 2.  However, "an ALJ is not required to

discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons*, 114 Fed. Appx. at 733.  Notwithstanding an ALJ's lack of obligation to discuss every piece of evidence, the ALJ did not ignore evidence that Wilson claims supports the credibility of her symptoms.

The ALJ considered Wilson's reported difficulties with showering, e.g., he considered Wilson's reported need to use a shower seat.  Tr. 57.  Additionally, the ALJ noted that Wilson spent her days mostly in her recliner chair.  Tr. 57.  In doing so, the ALJ cited both Wilson's hearing testimony and her Function Report (Exhibit B3E (Tr. 343-352)).  In the Function Report cited and considered by the ALJ, Wilson stated that she was confined to her recliner and had to sleep upright.  Tr. 344.  Furthermore, while the ALJ did not specifically refer to Wilson's testimony regarding her desire to stay in her pajamas, the ALJ noted that Wilson isolated at home.  Tr. 57.

Here, the ALJ considered the evidence of record, including evidence that Wilson points to in support of her claim, but did not find Wilson's allegations entirely credible.  It is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Moreover, Wilson has not shown that the ALJ's assessment of her subjective complaints is unsupported by substantial evidence.  Thus, even if evidence that Wilson points to supports her position, reversal is not warranted. *Jones*, 336 F.3d at 477.  (Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ.").

Considering the foregoing, the undersigned finds that Wilson has not shown that the ALJ ignored evidence when assessing Wilson's subjective allegations nor has she shown that the

ALJ's assessment of her subjective allegations is not supported by substantial evidence.  Thus, the Court finds that reversal and remand is not required for further assessment of Wilson's subjective allegations.

**D.     The ALJ did not err at Step Five**

Wilson argues that the ALJ did not satisfy her burden at Step Five.  Doc. 16, pp. 21-23. An ALJ is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. Aug. 18, 2009).  To satisfy his burden at Step Five, the Commissioner must make "a finding supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Secretary of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)(alteration in original).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question[].]"  *Id.* (internal citation omitted).  Here, to support his Step Five determination, the ALJ relied upon VE testimony in response to a hypothetical question that reflected the limitations contained in the ALJ's ultimate RFC assessment.

Wilson challenges the ALJ's Step Five finding on a number of grounds.  First, Wilson contends that she objected, orally and in writing, to the VE's testimony that Wilson would be able to perform jobs at a sedentary level and she asserts that the ALJ's decision to overrule her objection constituted harmful error.  Doc. 16, p. 22 (citing Tr. 132-133 and 388-414).  Contrary to Wilson's argument, her objection was more limited in scope.  As the record reflects, her objection pertained to only one of the jobs identified by the VE in response to the ALJ's hypothetical, i.e., the surveillance system monitor.  Tr. 62, 132, 388.  Wilson also contends that the ALJ did not fully answer a question regarding a surveillance system monitor need to focus

and maintain attention and concentration.  Doc. 16, p. 22.  As the record indicates, there were

two additional jobs identified by the VE in response to the ALJ's hypothetical question upon

which he relied, i.e., food and beverage order clerk and touch-up screener, printed circuit boards.

Tr. 62, 129-130.  Thus, the Court finds that Wilson has not shown reversible error based on the

ALJ's decision to overrule her limited objection to the VE's testimony regarding the surveillance

system monitor or her contention that the VE did not fully answer a question relating to the

surveillance system monitor job.

Second, Wilson argues that the VE's testimony was inconsistent because, in one instance,

he testified that there would be jobs available for an individual with the RFC as assessed by the

ALJ, which included the need to use a rollator for ambulation and station, but he also testified

that there would be no jobs available if the individual needed a sit/stand option and needed to use

a cane when standing.  Doc. 16, p. 23.  In advancing this argument, Wilson relies on *Lindsey v.*

*Comm'r of Soc. Sec.*, 1:18cv2158, 2019 WL 4918679 (N.D. Ohio Oct. 4, 2019).[12]  Doc. 16, p. 23.

In *Lindsey*, this Court reversed the matter because the ALJ's explanation and cited

evidence did not support his finding that a cane was not medically necessary.  *Id.* at 15-16.  Here,

the ALJ found that use of a rollator was necessary and as such included in the RFC the need to

use a rollator for ambulation and station.  Thus, *Lindsey* is not on entirely on point.  Also, in

*Lindsey*, this Court found that the ALJ misinterpreted the VE's testimony regarding the impact

that use of a cane or walker would have on the availability of jobs.  *Id.* at 16.  In *Lindsey*, the VE

testified that using a cane or walker when walking would not have an impact on the type or

number of jobs identified by the VE but, contrary to the ALJ's findings, the VE also testified that

using a cane or walker when standing or balancing would impact the type and number of jobs

---

[12] Both Plaintiff's and Defendant's Briefs contain an incorrect citation (2019 WL 4913679).  The correct citation is 2019 WL 4918679.

identified.  *Id.*  In contrast to the facts in *Lindsey*, in this case, the VE testified that use of a rollator or cane while walking <u>or</u> standing would not have an effect on the jobs identified as being available to an individual as described in the RFC ultimately assessed by the ALJ, i.e., one in which a rollator was required for ambulation or station.  Tr. 56, 128-129, 130.  Accordingly, *Lindsey* is further distinguishable on its facts and not dispositive of this case.

Wilson also contends that the ALJ's findings relative to use of a rollator are contrary to SSR 96-9p (*Determining Capability To Do Other Work--Implications of a Residual Functional Capacity For Less Than A Full Range Of Sedentary Work*, 1996 WL 374185 (July 2, 1996)). Doc. 20, pp. 3-4.  SSR 96-9p explains that, since the need to use a hand-held assistive device for walking or standing may significantly erode the sedentary occupational base, consulting a vocational expert regarding the individual's ability to adjust to other work "may be especially useful."  SSR 96-9p, *Determining Capability To Do Other Work--Implications of a Residual Functional Capacity For Less Than A Full Range Of Sedentary Work*, 1996 WL 374185, * 7 (July 2, 1996).  Consistent with the instructions in SSR 96-9p, the ALJ questioned the VE regarding the effect use of a rollator or cane would have on the type and number of jobs available to an individual having Wilson's assessed RFC.  In response, the VE identified jobs that would be available.  While Wilson disagrees and challenges that testimony, the VE was qualified to testify and he explained that his testimony was consistent with the DOT and/or was based on his experience doing job analysis and labor market surveys.  Tr.  125, 130.

The Court finds that the ALJ properly relied on the expert testimony provided by the VE in this case and that testimony was in response to a hypothetical question containing the RFC restrictions that the ALJ ultimately found were supported by the evidence.  Considering the foregoing, the Court finds that Wilson has not shown error at Step Five.

## VI. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: August 16, 2021                                 */s/ Kathleen B. Burke*
                                                       Kathleen B. Burke
                                                       United States Magistrate Judge